BURTON

v.

BURTON.

1. Refusal of a husband to live with his wife is not extreme cruelty, in the absence of proof that it has had, or tends to have, a serious effect on her health.

2. A divorce on the ground of the husband's alleged cruelty will not be granted where it appears that the parties lived together for many years after the acts of cruelty were charged to have been committed, and they were of such a nature that, owing to the age of the parties, there is little probability, or even possibility, that they would be committed again, as it is a preventive remedy to protect the life and health of the wife, and not to punish the husband.

Bill for divorce *a mensa et thoro* and alimony.

*Mr. Frank C. Willcox*, for the complainant.

*Mr. Alexander Grant*, for the defendant.

GREEN, V. C.

The parties to this action were married in 1855. In 1874 they removed from Jersey City and went to live at 190 Lafayette street, in Brooklyn. In 1876 the defendant told his daughter, who was living with them, to occupy the room with her mother, and he took the daughter's room. From that time to the present he has not occupied his wife's bed. He gives as an excuse for this that his wife, having inherited some $16,000, speculated in Wall street, and was frequenting brokers' offices ; that he remonstrated

with her, when she told him she would associate with those she
liked better than she did him; that she also refused what he
considered reasonable requests. She complains that from that
time on he did not speak to her, but addressed any remark he
intended for her ears to a third person. They continued keep-
ing house until 1884. There is much dispute as to which one
paid the rent and expenses of the family, which I think imma-
terial to this controversy. They also differ as to who was to
blame for breaking up housekeeping, he saying it was her wish,
she, that it was his determination. He continued to support his
wife and daughter until 1886. In this year he sold a property
in Clinton avenue, Brooklyn, which he had purchased in 1867.
He says that he paid the whole purchase-price of this property,
but she claims that she paid one-half thereof. At all events, she
would not sign the deed until he paid her $2,050, half the money
he received on the sale. They were at this time living in sepa-
rate homes. He says that he then told her he would not con-
tinue her support until she had expended the difference between
what her dower right would have been worth and the one-half
she exacted. Be it as it may, he stopped his contributions, and
she had him arrested in Brooklyn for non-support, and he was
ordered to pay his wife $10 a week. He gave bond for this
payment for one year, and did pay it, as well as giving his
daughter $40 a month and sometimes more. He continued
these payments to his wife for two years after the time named
in the bond, and to the daughter after her marriage and until
her husband was in fair circumstances. He also gave his
daughter money at the time of her marriage and at times when
she applied for it. As I understand the evidence, he continued
paying $10 a week for his wife's support until 1891. In the
early part of that year he rented a house in Newark. He had
previously purchased a property in Belleville, the title of which
stood in the names of himself and son, and had commenced
building a house thereon. He was very desirous of placing a
mortgage upon this property, but his wife refused to join in it.
He subsequently secured the whole title. In May, 1891, he
addressed the following letter to his wife:

Burton v. Burton.

"New York, May 26th, 1891.

"*Mrs. O. F. Burton:*

"Madam—Declining health has caused me to change my residence from the city of Brooklyn to the country. I have, therefore, rented a house, No. 389 Washington Ave., North Newark, N. J., where you are welcome to bed and board on and after June 5th, 1891; and after the said date, I shall cease to pay to the Brooklyn Board of Charities the allowance awarded by the court for your support.

"For any further arrangement for a separate maintenance, I hereby refer you to my attorneys, Messrs. De Witt & Prevost, No. 445 Broad St., Newark, N. J. Their card enclosed.

"O. F. Burton."

The complainant went to the office of Mr. De Witt, where she met her husband and asked him what provision he intended to make for her, and he replied by saying to De Witt, "You have my terms." He says that he wrote this letter because he thought it would make her sign the mortgage. In July, 1891, she had him arrested in Newark for non-support. She had him arrested in Brooklyn a second time, but it is not clear if this was before or after the Newark arrest. The latter, defendant says, was on a very hot day; that the justice refused to take his own recognizance, and that he was locked up in a noisome cell and kept there until he could get Mr. Sandford to come from Belleville and bail him out. He admits that he has addressed no conversation to his wife since she had him arrested and incarcerated in Brooklyn in 1887, and gives as his excuse her persecutions, as he terms her conduct, both as to arresting and imprisoning him and crossing his wishes in reference to property which he had bought. He was discharged both in the proceedings in Brooklyn and in Newark. The complainant then brought this suit. I do not stop to examine whether the excuse he gives for separating himself from his wife's bed, and subsequently from the house in which she lived, viz., that she persisted, against his remonstrances, in frequenting brokers' offices in Wall street, refused her co-operation in improving his property, thwarted his plans of realizing on it, are established by the evidence, or are, if true, coupled with his repeated arrests, a justification, because I do not think that such separation from bed and home is extreme cruelty, as used by the statute, in the absence of evidence that it

has had, or tends to have, serious effect upon the health of the wife. There is no such evidence in this case. But she also testifies that he has been guilty of acts of personal violence towards her. She, however, only specifies two occasions. One in Jersey City, in 1874, when she says he insisted on her doing some sewing for him on Sunday, and on her refusal, took her by the throat and choked her. She says that as she regained her upright position her head struck his face and blackened his eyes; that the children were at the time at Sunday-school.

The other occasion, she says, was in 1869, when he struck her in the presence of Mrs. Fountain. There is no evidence by any-one who has known or lived with her or near these parties during their home life, from 1855 to 1887, a period of thirty-two years, who is produced as a witness to a single act of per-sonal indignity or violence. The daughter, who has always been with her mother, says she never knew her father to use violence to her mother. He emphatically denies both statements. They were condoned if they ever occurred. She is explicit in her statement that the occurrence in 1874 was the last act of cruelty on her person. They lived after that in the same home, either keeping house or boarding, although not occupying the same room, until 1887, or thirteen years and more, and he, so far as the evidence shows, never attempted to do her bodily injury, except that she says in 1884 he attempted to poison her and did produce abortion. Her grounds for the first accusation are so unsubstantial that the charge gives rise to the suspicion that she is under some hallucination with reference to her husband, or, at least, is ready or eager to believe him capable of anything, no matter how criminal or outrageous.

As to the other charge, she testifies that, after the birth of her daughter in 1859, he performed on her, while *enciente,* a criminal operation with an instrument made of whalebone, and thereby produced a premature birth, and that he thus produced on her person abortion no less than ten different times. Defendant denies all these charges. There is no corroboration whatever. Of course it would be difficult to find corroborative evidence of the specific act. Cruelty by husband to wife, either by beating

or poison or abortion, would almost invariably be done in secret. But there are always some attendant circumstances or resulting conditions that afford some means of verification. As to the incident of violence she swears to, in 1874, in Jersey City, she says her husband's eyes were blackened. Her son was then eighteen years of age and the daughter fifteen, and they would undoubtedly have remembered such a fact, but they fail to substantiate the statement. There is no evidence on the point, but I suppose it may be taken as true that an abortion produced by instruments would result in serious illness, and its repeated production would have left its victim a physical wreck instead of the (to all appearances) well-preserved matron who tells the story. I confess that I am unable to believe these accusations which the complainant makes of these attempts upon her health and life. They are at war with the whole life and character of defendant, and with the fact of their continued life together for many years. But if true, each and every of these acts was subsequently condoned. He is now seventy years of age and she is sixty-seven years of age. They have not lived in the same house together since 1884. There is little probability, if possibility, that any such offence would again be committed. Divorce on the ground of extreme cruelty is a preventive remedy to protect the life and health of the wife and not for the punishment of the husband.

In my opinion, the facts do not justify a decree of divorce from bed and board, and I will advise that the bill be dismissed.